```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION
```

NICHOLAS D. BROOKS,             §
                                §
    Plaintiff,                  §
                                §
v.                              §     CIVIL ACTION NO. H-14-2153
                                §
RYDER SYSTEM, INC.,             §
                                §
    Defendant.                  §

                    MEMORANDUM AND ORDER

Pending is Defendant's Motion for Summary Judgment (Document No. 17).  After having considered the motion, response, reply, the applicable law, and the administrative record, the Court concludes as follows.

## I. Background

Plaintiff Nicholas D. Brooks ("Plaintiff") brings this suit under the Employment and Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, alleging that Defendant Ryder System, Inc. ("Defendant" or "RSI") wrongly denied him medical and wage replacement benefits and failed timely to respond to his requests for information.[1]

---

[1] Document No. 1 (Compl.).

Until August 31, 2013, Plaintiff was employed as a truck driver by Ryder Integrated Logistics, Inc. ("RIL").[2] RIL is a non-subscriber under the Texas Workers' Compensation Act, and participates in the Ryder Texas Occupational Injury Benefit Plan (the "Plan") to provide medical and wage replacement benefits to its employees.[3] Defendant RSI is the plan administrator of the Plan, Gallagher Bassett Services, Inc. ("Gallagher Bassett") is the claims administrator, and PartnerSource, Inc. ("PartnerSource") is the appeals committee.[4] Neither Gallagher Bassett nor PartnerSource is an affiliate or subsidiary of RIL or RSI.[5]

On July 26, 2013, Plaintiff slipped and fell off the end of his flatbed trailer, injuring his lower back and thumb.[6] When emergency responders arrived, they found Plaintiff lying on the ground unable to move, complaining of "severe lower back pain and right thumb pain."[7] Plaintiff was taken to Sweeny Community Hospital, where he reported severe pain and was initially unable to

---

[2] See id. ¶ 9; Document No. 17, ex. A ¶ 6; Document No. 20 at 2.

[3] Document No. 17, ex. A ¶ 5; Document No. 20 at 2. See also Document No. 17, ex. B (the Plan).

[4] Document No. 17, ex. A ¶ 3; Document No. 20 at 2.

[5] Document No. 17, ex. A ¶ 3; Document No. 20 at 2.

[6] Document No. 18-3 at 3 of 25.

[7] Document No. 18-2 at 10 of 22.

walk.[8] Plaintiff was diagnosed with a dislocated thumb, which was reduced[9] and splinted, and with lumbar strain and contusion.[10] X-rays of Plaintiff's right thumb were "unremarkable," showing no bone or joint abnormality, joint spaces well preserved, and normal soft tissues.[11] A CT scan of Plaintiff's cervical spine indicated no fracture or dislocation, disc spaces well preserved, and normal soft tissues.[12] Plaintiff was discharged later that day.[13]

Plaintiff was examined at Concentra Medical Centers on July 29 and August 2, 2013, producing further assessments that his thumb had been sprained and dislocated and that his back was strained.[14] Plaintiff was cleared to return to work with restrictions, including that he could not drive company vehicles, and was

---

[8] Document No. 18-1 at 4 of 21.

[9] In the medical context, "reduction" refers to "the replacement or realignment of a body part in normal position or restoration of a bodily condition to normal." Merriam-Webster Dictionary, http://www.merriam-webster.com/medical/reduction (last visited August 26, 2015).

[10] Document No. 18-1 at 5 of 21, 21 of 21.

[11] Id. at 14 of 21.

[12] Plaintiff's medical record contains three reports of the CT scan signed minutes apart, with minor differences. Id. at 15 of 21 to 17 of 21. Two of them conclude that the scan is unremarkable, with one noting slight scoliosis, and the third notes "[m]ild spondylotic and arthritic change are present," indicating an impression of "Spondylosis/osteoarthritis." Id.

[13] Id. at 21 of 21.

[14] Document No. 17, ex. C at 000200 to 000202.

referred to an orthopedic specialist for further examination of his thumb injury.[15]

On August 8, Gallagher Bassett conducted a recorded phone interview of Plaintiff to discuss his claim, in which Plaintiff confirmed that he knew when his next follow-up appointment was, and Gallagher Bassett informed Plaintiff that he "must attend all your follow up appointment[s] as scheduled" and "if you miss too many appointments your claim can be denied."[16] In a letter dated August 16, 2013, Gallagher Bassett, the claims administrator, notified Plaintiff that (1) he had missed his August 27, 2013 appointment with Dr. Dean Smith, who is an orthopedic specialist, (2) his appointment had been rescheduled to September 16, 2013, and (3) "any further failure to comply with any provision of the Plan, including the keeping of scheduled appointments with health care providers, will result in termination of your benefits claim under the Plan."[17]

---

[15] Id.; Document No. 18-3 at 12 of 25.

[16] Document No. 17, ex. C at 000169, 000171.

[17] Document No. 18-3 at 14 of 25. If actually sent on August 13, 2013, the warning letter obviously could not describe a missed appointment 11 days later on August 27. A careful reading of the submissions evidences that the warning letter was actually sent August 29. PartnerSource noted in its January 27, 2014 denial of benefits that:

> On August 24, 2013, the Nurse Case Manager for your claim left you a voicemail advising you that you were scheduled to see Dr. Smith on August 27, 2013. You failed to keep

On August 31, RIL terminated Plaintiff's employment.[18] Prior to his termination, he had been suspended but was receiving regular pay continuously from the date of his injury.[19]

On September 16, Dr. Smith examined Plaintiff's thumb and recommended an MRI.[20] Dr. Smith noted "[s]ignificant pain on exam," but that Plaintiff's tendons appeared intact, he was "able to initiate flexion and extension of the digits to the involved extremity," and there was no swelling.[21] Five days later, Plaintiff's MRI exam revealed that everything was normal except for "[m]inimal osteoarthritis of the 1st MCP joint."[22]

---

this appointment with Dr. Smith and instead re-scheduled it for September 16, 2013. As a result, the Plan sent you a warning letter *on August 29, 2013* warning you that failing to keep any future appointments could potentially result in the denial of further benefits could be terminated for failure to keep scheduled appointments.

Id. at 21 of 25 (emphasis added). *See also* Document No. 17, ex. C at 000220 (November 12, 2013 letter from Gallagher Bassett stating that warning letter was sent on August 29, 2013).

[18] Document No. 20 at 2.

[19] Document No. 17, ex. A ¶ 16; id., ex. D.

[20] Document No. 17, ex. C at 000205.

[21] Id.

[22] Id., ex. C at 000207; *see also* id., ex. C at 000209 ("MRI report: mild thumb MP arthritis and joint space narrowing, intact ligaments.").

By letter dated October 8, 2013, Gallagher Bassett, the claims administrator, notified Plaintiff of the partial denial of his Plan benefits, explaining that treatment of osteoarthritis is not covered under the Plan because it is a degenerative condition and not a work-related injury.[23] Plaintiff appealed the decision a month later.[24]

Three days after Plaintiff's appeal, on November 12, Gallagher Bassett notified Plaintiff by letter that his claim was denied in full because Plaintiff had missed two scheduled appointments.[25] In addition to the August 27 missed appointment, the letter noted that "our records indicate that you missed your October 24, 2013 appointment with the Approved Physician. The Nurse Case Manager and Dr. Dean Smith's office contacted you and left several voice mails in regards to your missed appointment but you failed to return their calls."[26] Plaintiff responded by letter dated December 23, 2013, recounting his injuries and treatment and requesting full

---

[23] Document No. 18-3 at 9 of 25 to 11 of 25.

[24] Id. at 16 of 25.

[25] Document No. 17, ex. C at 000220.

[26] Id.

medical and wage replacement benefits.[27] Plaintiff's appeal letter did not address his missed appointments.

PartnerSource, the appeals committee, referred Plaintiff's case to a peer review, which was performed by Dr. Gary N. Pamplin.[28] Dr. Pamplin reviewed Plaintiff's medical records[29] and concluded that based on the radiographic and MRI tests, Plaintiff suffered from degenerative joint disease, and

> In the absence of discernible specific scientific credible data to the contrary, and based on medical probability, <u>it is reasonable to conclude that the natural and progressive course of this pre-existing disease of life was neither enhanced, accelerated, altered, or aggravated in any manner by the reported occupational event of</u> 7/26/13.[30]

Dr. Pamplin further concluded that

---

[27] Document No. 18-3 at 17 of 25 to 18 of 25. Plaintiff's letter stated that "[a]fter reading the MRI Dr. Dean [Smith] recommended surgery and when he contacted Ryder the procedure was not approved and he stopped treatment until he could get approval," and that Plaintiff was still experiencing pain and was not receiving the recommended treatment "due to Ryder's refusal." Id. at 17 of 25. This representation conflicts with Plaintiff's medical records, in which Dr. Smith opines that surgery is inappropriate. *See* Document No. 17, ex. C at 000210 ("Surgery/MP fusion is indicated for severe arthritic joint changes only and is not indicated here.").

[28] Document No. 17, ex. A ¶ 22; id., ex. C at 000260 to 000266.

[29] These included a record submitted by Plaintiff from Dr. John L. Mohney, which Dr. Pamplin noted "is handwritten and has so many illegibly handwritten entries as to make it essentially of no medical value." Id., ex. C. at 000264.

[30] Id., ex. C at 000261 (emphasis in original).

> There is no documentation that would support further medical services for the lumbar-related diagnosis based on the following discussion: There is only one clinical note relating to complaints and treatment of the lumbar area (strain and contusion), and this was on the reported DOI of 7/26/13. Based on that fact, and based on medical probability relating to the healing process of soft tissue, and based on the absence of specific credible scientific data to the contrary, **it is reasonable to conclude that the effects naturally flowing from the injury-diagnosis of the lumbar area would have resolved by September 6, 2013**, based on [a table from the Official Disability Guidelines/Treatment in Workers' Compensation evidence-based protocols].[31]

Dr. Pamplin noted the possibility of "some degree of significant ligament injury to the metacarpal-phalangeal joint of the right thumb," and recommended further evaluation by a "board-certified orthopaedic hand surgeon specialist."[32]

After reviewing Plaintiff's appeal and medical records, PartnerSource on January 27, 2014, denied Plaintiff's appeal in full.[33] PartnerSource stated that it was denying Plaintiff's appeal for continued medical benefits "because (1) the Plan specifically excludes the claimed injury to your right thumb as a 'Non-Covered Injury;' and (2) you failed to comply with the Plan's requirement to attend all scheduled appointments with your medical providers," and that it was denying Plaintiff's appeal for wage replacement benefits because Plaintiff was paid for the time period while he

---

[31] Id., ex. C at 000262 (emphasis in original).

[32] Id., ex. C at 000263.

[33] Document No. 18-3 at 19 of 25 to 23 of 25.

was on suspension, and wage replacement benefits cease under the Plan upon termination.[34]

Plaintiff filed suit against Defendant RSI under 29 U.S.C. § 1132(a) and (c), alleging that he is entitled under the Plan to recover medical and wage replacement benefits, and that RSI failed to provide him with documents and records used in deciding his appeal within 30 days of his request as required by ERISA.[35] Defendant moves for summary judgment, arguing that it properly denied Plaintiff benefits and that Plaintiff never requested documents from Defendant.[36]

## II. Legal Standard

ERISA confers jurisdiction on federal courts to review benefit determinations by fiduciaries or plan administrators.[37] *See* 29

---

[34] Id. at 19 of 25.

[35] Document No. 1.

[36] Document No. 17. Defendant also filed a counterclaim to recover its attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g). Document No. 8 at 6. Neither party has moved for summary judgment on Defendant's counterclaim.

[37] The Plan contains a venue provision stating that "any action challenging a Plan decision, or any other ERISA right of action, must be brought in the United States District Court for the Northern District of Texas, Dallas Division." Document No. 17, ex. B at 000029. Defendant has not challenged venue in this Court, and any such objection is waived. *See* FED. R. CIV. P. 12(h) (defense of improper venue waived if not included in responsive pleading).

U.S.C. § 1132(a)(1)(B). A plan claims administrator makes two general decisions when deciding whether to pay benefits: (1) finding the facts underlying the claim and (2) determining "whether those facts constitute a claim to be honored under the *terms* of the plan." Schadler v. Anthem Life Ins. Co., 147 F.3d 388, 394 (5th Cir. 1998) (quoting Pierre v. Conn. Gen. Life Ins. Co./Life Ins. Co. of N. Am., 932 F.2d 1552, 1557 (5th Cir. 1991)) (emphasis in original). The administrator's first decision, its fact finding, is always reviewed for abuse of discretion. Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan, 493 F.3d 533, 537 (5th Cir. 2007), *abrogated on other grounds by* Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149 (2010). The second determination, the administrator's interpretation of the plan, is typically reviewed *de novo*, "[b]ut where, as here, a plan expressly confers discretion on the plan administrator to construe the plan's terms, the administrator's construction is reviewed for abuse of discretion." Id. at 537–38 (internal footnote omitted); *see also* Firestone Tire & Rubber Co. v. Bruch, 109 S. Ct. 948, 956–57 (1989). Because the Plan confers discretionary authority upon

Gallagher Bassett and PartnerSource,[38] their determinations are appropriately reviewed for an abuse of discretion.

When reviewing the administrator's second decision--interpretation and application of the plan language--for an abuse of discretion, the Fifth Circuit applies a two-step inquiry. Stone v. UNOCAL Termination Allowance Plan, 570 F.3d 252, 257 (5th Cir. 2009). First, the court examines whether the determination was legally correct; if so, there can be no abuse of discretion. Id. If not legally correct, then the court proceeds to step two to decide whether the determination was an abuse of discretion. Id.

An abuse of discretion occurs when "the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." Holland v. Int'l Paper Co. Ret. Plan, 576 F.3d 240, 246 (5th Cir. 2009) (internal quotation marks and citation omitted). Such an abuse occurs "only where the plan administrator acted arbitrarily or capriciously," and "[a] decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." Id. (citing Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168

---

[38] See Document No. 17, ex. B at 000044 to 000045 ("Subject to the Plan claims procedures, the Claims Administrator and Appeals Committee shall have discretionary and final authority to interpret and implement the provisions of the Plan, including, but not limited to, making all factual and legal determinations, correcting any defect, reconciling any inconsistency and supplying any omission, and making any and all determinations that may impact a claim for benefits hereunder.").

F.3d 211, 214-15 (5th Cir. 1999)) (internal quotation marks omitted). The decision need only "fall somewhere on a continuum of reasonableness--even if on the low end." Corry v. Liberty Life Assur. Co. of Boston, 499 F.3d 389, 398 (5th Cir. 2007) (quoting Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 297 (5th Cir. 1999) (en banc), *overruled on other grounds by* Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008)). The district court, in reviewing the administrator's decision, should consider only the evidence that was before the administrator, assuming that both parties had the opportunity to present facts to the administrator. *See* Meditrust, 168 F.3d at 215.

### III. Analysis

A.  Timeliness of Plaintiff's Response

As an initial matter, Defendant argues in its reply that the Court should deem its motion for summary judgment unopposed because Plaintiff did not file his response until 18 days after the deadline for responding, and neither sought leave to file the response late nor provided any explanation for his failure to meet the deadline.[39]  *See* Local Rule 7.4.  Although the Court expresses its disapprobation for Plaintiff's conduct in the foregoing

---

[39] Document No. 19 at 1-2.  Defendant filed its motion on May 29, 2015, so Plaintiff's response was due on June 19. Plaintiff did not respond until July 7.

respects, in this instance the Court was unable earlier to consider Defendant's motion and, because it is generally preferable to decide cases on the merits, the Court has considered Plaintiff's late-filed response.

B.  Plan Coverage for Treatment of Plaintiff's Thumb

The Plan covers medical treatment of injuries that are "incurred in, and directly and solely result from, the Course and Scope of Employment."[40] The Plan expressly excludes coverage of osteoarthritis and degenerative joint disease:

> **Types of Non-Covered Injuries.** Any provision of this Plan to the contrary notwithstanding, the term Injury shall not include:
>
> (1) any strain, degeneration, damage or harm to, or disease or condition of, the eye or musculoskeletal structure or other body part resulting from use of a video display terminal or keyboard, poor or inappropriate posture, the natural results of aging, osteoarthritis, arthritis, or degenerative process (including, but not limited to, degenerative joint disease, degenerative disc disease, degenerative spondylosis/spondylolisthesis and spinal stenosis), or other circumstances prescribed by the Claims Administrator which do not directly and solely result from the Participant's Course and Scope of Employment.[41]

In finally denying Plaintiff medical benefits related to treatment of his thumb, PartnerSource relied on the MRI exam of

---

[40] Document No. 17, ex. B at 000017.

[41] Id., ex. B at 000018.

13

Plaintiff's thumb, which revealed minimal osteoarthritis and no other discernible injury; Dr. Smith's conclusion that Plaintiff was experiencing early signs of degenerative joint disease; and Dr. Pamplin's conclusion that "the natural and progressive course of this pre-existing disease of life was neither enhanced, accelerated, altered, or aggravated in any manner by the reported occupational event of 7/26/13."[42] This medical evidence, particularly in the absence of specific medical evidence demonstrating any enduring non-degenerative injury, establishes that Defendant's denial of benefits for Plaintiff's thumb was not arbitrary and capricious. *See* Corry, 499 F.3d at 398 ("Substantial evidence [sufficient to establish no abuse of discretion] is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). Accordingly, Defendant did not abuse its discretion in determining that Plaintiff's thumb pain was caused by a degenerative condition which was not a covered injury under the Plan.

C.   Denial of Benefits for Failure to Attend Scheduled Appointments

The Plan provides that

---

[42] Document No. 18-3 at 20 of 25 to 21 of 25.

> [t]he Claims Administrator may deny a claim for, or suspend or terminate the payment of, Plan benefits otherwise due a Participant if:
>
> . . .
>
> (h) the Participant fails to keep, or is late for, a scheduled appointment with a health care provider. Except in extraordinary circumstances as determined by the Claims Administrator, a first missed appointment shall result in a warning and/or suspension of benefits and a second missed appointment shall result in a termination of benefits.[43]

It is undisputed that Plaintiff missed scheduled medical appointments on August 27, 2013 and October 24, 2013, and that Plaintiff received a written warning after the first missed appointment informing him that further missed appointments "will result in a termination of your benefits claim under the Plan."[44]

Plaintiff argues, however, that he never received the phone calls regarding his scheduled appointments because Gallagher Bassett was using his former work cell phone number to contact him, and that therefore "*[t]he plan administrator abused its discretion in finding that Brooks was* noncompliant in keeping his medical appointments when he was not being properly informed of the scheduled appointments."[45]   Nevertheless, when Plaintiff was

---

[43] Document No. 17, ex. B at 000042 to 000043.

[44] *See* Document No. 18-3 at 14 of 25.

[45] Document No. 18 at 5 (emphasis in original). Defendant argues that Gallagher Bassett in fact had Plaintiff's correct phone number and spoke with him on the phone, citing Plaintiff's deposition testimony. Document No. 19 at 5. Although Plaintiff

notified of the termination of his benefits on the basis of his missed appointments, he did not make this argument as part of his appeal. "Assuming that both parties were given an opportunity to present facts to the administrator, our review of factual determinations is confined to the record available to the administrator." Meditrust, 168 F.3d at 215. Plaintiff's December 23, 2013 letter to PartnerSource provided "pertinent medical records" but made no reference whatever to his missed appointments and offered no excuse for such.[46] There is no evidence in the record that Plaintiff ever provided to PartnerSource as part of his appeal any evidence or argument regarding the allegedly wrong phone number or any other excuse for having missed two medical appointments, despite having had the opportunity to do so. Accordingly, PartnerSource did not abuse its discretion in finding on the record before it that Plaintiff had missed two appointments and that his medical benefits should therefore be terminated based on the Plan's requirements.

---

testified in his deposition that Gallagher Bassett's representative had called him, he immediately stated that in fact Plaintiff had made the phone call. See Document No. 19, ex. A at 240:15-24 ("Q. He called you on the phone and took your statement; right? A. Yes, sir. Q. Did he call you on your cell phone? A. You asked me what are you doing is you're asking did he call me on my cell phone. No, he did not call me on my cell phone. Q. What number did he call you at? A. He didn't call me on my cell phone, sir. I called him."). Viewing the evidence in the light most favorable to Plaintiff, a fact issue exists as to whether Gallagher Bassett had Plaintiff's correct phone number.

[46] Document No. 18-3 at 17 of 25 to 18 of 25.

16

D.  Denial of Wage Replacement Benefits

The Plan provides that wage replacement benefits "shall continue until the earliest of . . . (4) termination of both the Participant's status as a Covered Employee <u>and</u> all other employment of the Participant with an Employer," subject to certain exceptions that are inapplicable here.[47] "**'Covered Employee'** means an Employee whose employment with the Employer is principally located within the State of Texas."[48]

It is undisputed that RIL terminated Plaintiff on August 31, 2013.[49] The uncontroverted summary judgment evidence is that Plaintiff received his regular wages from the time of his injury through his termination, while he was suspended.[50] Plaintiff argues, however, that "[t]he plan administrator abused its discretion in denying wage replacement benefits after August 31, 2013" because RIL had wrongfully terminated Plaintiff.[51] Plaintiff has filed a separate suit in this Court challenging his

---

[47] Document No. 17, ex. B at 000035 (emphasis in original).

[48] <u>Id.</u>, ex. B at 000014.

[49] Document No. 20 at 2.

[50] Document No. 17, ex. A ¶ 16; <u>id.</u>, ex. D. This is identified as a contested issue in the parties' Joint Pretrial Report, Document No. 20 at 3, but Plaintiff produces no evidence to raise a fact issue that he was not fully paid up to the date of his termination.

[51] Document No. 18 at 5.

termination,[52] and argues that if he was wrongfully terminated, "he would be entitled to wage replacement after August 31, 2013."[53]

Plaintiff has not cited to any Plan provision or any legal authority to establish that he would be entitled to wage replacement benefits under the Plan if his termination was wrongful. Instead, under the plain language of the Plan quoted above, Plaintiff's entitlement to wage replacement benefits only lasted until termination of his employment. Accordingly, Defendant correctly interpreted the Plan and did not abuse its discretion when it denied Plaintiff's claim for wage replacement benefits following his termination on August 31, 2013.

E.  Plaintiff's Request for Records

Finally, Plaintiff argues that he is entitled to recover penalties under 29 U.S.C. § 1132(c)(1), which provides:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or

---

[52] Brooks v. Ryder Integrated Logistics, Inc., Case No. 4:14-cv-1584 (Judge Bennett presiding).

[53] Document No. 18 at 5.

>  refusal, and the court may in its discretion order such
>  other relief as it deems proper.

Plaintiff argues that he "sent a request for all documents considered in his appeal by letter dated February 10, 2014 and sent by certified mail on February 14, 2014 to Partner Source," which was the appeals committee, but that "[a]fter receiving the request for the administrative record, Partner Source failed to submit the records until contacted by the U.S. Department of Labor."[54]

Defendant disputes that Plaintiff ever sent such a request to PartnerSource.[55] This dispute is immaterial, however, because--even if so--the uncontroverted summary judgment evidence is that PartnerSource never transmitted Plaintiff's request for documents to Defendant itself.[56] Moreover, Plaintiff does not allege--much less produce evidence--that he ever sent any request for documents

---

[54] Document No. 18 at 3. Plaintiff states that he received the record from the Department of Labor on June 25, 2014. Id. at 6.

[55] PartnerSource has no record of having received any materials from Plaintiff in February, March, April, or May of 2014. Document No. 17, ex. E ¶ 10. Plaintiff produces as evidence of his request (1) a handwritten note dated February 10, 2014 and addressed to PartnerSource, requesting all documents relevant to his claim for benefits, and (2) a tracking report from USPS indicating that an unidentified item was delivered to a location in Dallas, Texas. Document No. 18-3 at 24 of 25 to 25 of 25. Defendant argues that "the circumstances surrounding this letter are highly dubious, to say the very least," noting that the letter is handwritten, while every other correspondence from Plaintiff is typed; the letter has no item number to match it with the tracking report; and "the date appears to be written in darker ink than the remainder of the letter." Document No. 17 at 23 n.7.

[56] Document No. 17, ex. E ¶ 10.

to Defendant RSI. Plaintiff cites to no authority suggesting that Defendant could be held liable under Section 1132(c)(1) for "fail[ing] or refus[ing] to comply with a request" when it never received such a request.[57] Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for statutory penalties against Defendant under 29 U.S.C. § 1132(c)(1).

### IV. Order

Based on the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 17) is GRANTED, and Plaintiff's claims are dismissed with prejudice. Defendant's counterclaim for attorneys' fees and costs remains for adjudication.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 30th day of September, 2015.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

---

[57] The uncontroverted summary judgment evidence is that Defendant first received actual notice that Plaintiff was seeking documents when it was contacted by a Department of Labor representative on May 28, 2014. Id., ex. E ¶ 12. Defendant began gathering and sending documents to the Department of Labor representative, and Plaintiff acknowledges that he himself received the records on June 25, less than 30 days after Defendant became aware that he was seeking documents. Document No. 18 at 6.